IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

KATE SCHULTZ,
individually and on behalf of all others
similarly situated,

                            Plaintiff,                  OPINION AND ORDER

v.

                                                        16-cv-797-wmc

EPIC SYSTEMS CORPORATION,

                            Defendant.

---

On December 12, 2016, plaintiff Kate Schultz filed a "Collective and Class Action Complaint" against her then-employer, Epic Systems Corporation, seeking to represent quality assurance employees who were "commonly misclassified as exempt from overtime wages under state and federal law." (Compl. (dkt. #1) 1 (capitalization altered).) In response, Epic filed a motion to dismiss and compel individual arbitration (Mot. Dismiss (dkt. #8) 1) under a Mutual Arbitration Agreement Regarding Wages and Hours (the "Arbitration Agreement" or the "Agreement"), which requires all wage claims be submitted to individual arbitration (Def.'s MTD Br. (dkt. #9) 1).

After plaintiff filed her opposition, the parties requested and the court stayed all proceedings in light of the Supreme Court's grant of certiorari in *Epic Systems Corporation v. Lewis*, No. 16-285. (*See* J. Mot. Stay (dkt. #17) 1-3; Jan. 31, 2017 Order (dkt. #18).) On May 21, 2018, the Supreme Court issued its decision, explaining that "Congress has instructed that arbitration agreements like those before us must be enforced as written," reversing the Seventh Circuit's contrary decision. *Epic Sys. Corp. v. Lewis*, 138 S. Ct. 1612, 1632 (2018). The following day, this court asked plaintiff to explain why *Lewis* did not

require the court to grant defendant's pending motion. (May 26, 2018 Order (dkt. #26).)
Plaintiff responded that "Epic's Arbitration Agreement is procedurally and substantively unconscionable," an issue she raised briefly in a footnote in her opposition brief (Pl.'s Req. Extension of Time (dkt. #27) 2 (citing Pl.'s Opp'n (dkt. #12) 13 n.6)) and a possible defense arguably left open in light of *Lewis*, *see* 138 S. Ct. at 1622-23. Having agreed to at least consider these unconscionability arguments also, the court agreed to accept additional submissions by the parties on those arguments.[1] (June 12, 2018 Order (dkt. #29).) For the reasons that follow, the court now concludes that all issues before it in this case must be decided in the first instance in arbitration.

BACKGROUND[2]

Plaintiff Kate Schultz and the members of her putative class were employed by Epic as quality assurance employees during the three years immediately preceding the filing of the lawsuit. These employees were deemed to be exempt from overtime wages by Epic. Instead, they were paid fixed salaries that were not dependent on the hours they worked. Nevertheless, plaintiff alleges her colleagues and she performed job duties that were not

---

[1] In the meantime, Judge Crabb considered and rejected similar unconscionability arguments in *Lewis*. *See Lewis v. Epic Sys. Corp.*, No. 15-cv-82-bbc, 2019 U.S. Dist. LEXIS 11977, at *2, *7-*13.

[2] These facts are drawn from the complaint unless otherwise noted. The court also considers the Arbitration Agreement and its cover email and attached supporting FAQ sheet. *See 188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002) ("It is also well-settled in this circuit that 'documents attached to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to his claim. Such documents may be considered by a district court in ruling on the motion to dismiss.'" (quoting *Wright v. Assoc. Ins. Cos. Inc.*, 29 F.3d 1244, 1248 (7th Cir. 1994)) (holding that the district court appropriately considered a document attached to defendant's motion to dismiss because the court "needed to view [the document] to understand the nature of the dispute between the parties").

2

exempt from the Fair Labor Standards Act's overtime requirements as they were not responsible for managing Epic's customers or business operations, nor were they required to use discretion or independent judgment on significant matters.  Specifically, she alleges that their main job was to perform quality assurance work on software produced by Epic; more specifically, they used the software and documented problems they encountered.  As such, none of these employees were skilled in computers, such as software engineers, system analysts, or computer programmers might be.  In particular, they lacked a software background.  Plaintiff alleges that quality assurance employees routinely worked over 40 hours in a week and did not receive overtime compensation.  Moreover, she alleges that Epic knew or should have known this because it assigned the work and required quality assurance employees to record their hours.

On March 29, 2016, Epic circulated an Arbitration Agreement to its quality assurance employees via email; that Agreement had an effective date of April 12, 2016. (Def.'s MTD Br. (dkt. #9) 2-3.)  Among other things, the email explained that Epic began shifting to arbitration for wage-and-hour claims in April 2014, but did not include the quality assurance employees due to a then-ongoing lawsuit.  (Mar. 29, 2016 Email (dkt. #10-2) 2.)[3]  The email also explained that:

> We believe the benefits of arbitration outweigh litigation, which can be inefficient and wasteful.  Arbitration is a process

---

[3] In filing her original complaint, plaintiff specifically alleges that the Arbitration Agreement was provided to some employees in April 2014, but also notes that at the time of filing "the District Court for the Western District of Wisconsin and the Seventh Circuit Court of Appeals have ruled that this arbitration agreement is illegal and unenforceable." (Compl. (dkt. #1) ¶ 20.)  In moving for arbitration, defendant responded that "Epic understands and appreciates the impact of the Seventh Circuit's *Lewis* decision, but files the instant motion in order to preserve its right to compel arbitration if and when the United States Supreme Court overturns the Seventh Circuit's *Lewis* decision." (Def.'s MTD Br. (dkt. #9) 4 n.2.)

3

> outside of the court system that will allow you to pursue your individual claims with many of the rights and procedures that would be available in a lawsuit. The same laws apply in both. The arbitrator (whom you would participate in selecting) would be directed to reach a legal conclusion just as a judge would. The arbitrator can provide the same remedies as if you were in court. However, because arbitration puts some reasonable limits on processes, by addressing the merits of your claim through arbitration, rather than through individual litigation or class action, disputes can be resolved more quickly, with less expense and without the extraordinary distraction from our work that litigation often imposes.

(*Id.*) Additionally, the email noted that the attached agreement became effective on April 12, 2016, "provided you remain employed on that date." (*Id.*) Also attached to the email was a FAQ document about arbitration. (*See id.*)

The Agreement itself includes mutual promises to arbitrate:

> Epic Systems Corporation ("Epic") and I agree to use binding arbitration, instead of going to court, for any "covered claims" that arise or have arisen between me and Epic, its related and affiliated companies, and/or any current or former employee of Epic or a related or affiliated company. I understand that if I continue to work at Epic, I will be deemed to have accepted this Agreement.
> * * *
> **I understand and agree that arbitration is the only litigation forum for resolving covered claims, and that both Epic and I are waiving the right to a trial before a judge or jury in federal or state court in favor of arbitration.**

(Arbitration Agreement (dkt. #10-1) 2 (emphasis original).) It defines "covered claims" as "any statutory or common law legal claims, asserted or unasserted, alleging the underpayment or overpayment of wages, expenses, loans, reimbursements, bonuses, commissions, advances, or any element of compensation, . . . or any other claimed violation of wage-and-hour practices or procedures under local, state or federal statutory or common

4

law" including "based on claims of eligibility for overtime." (*Id.*) Further, the Agreement provided for a waiver of class and collective claims:

> I also agree that covered claims will be arbitrated only on an individual basis, and that both Epic and I waive the right to participate in or receive money or any other relief from any class, collective, or representative proceeding. No party may bring a claim on behalf of other individuals, and any arbitrator hearing my claim may not: (i) participate in or facilitate notification of others of potential claims; or (ii) arbitrate any form of a class, collective, or representative proceeding.

(*Id.*) Specifically excluded from the Agreement are "claims alleging discrimination, harassment, or retaliation," and "any claims that cannot be required to be arbitrated as a matter of law." (*Id.*) Finally, the Agreement expressly provides that both sides shall have the right to legal representation in arbitration (although neither would be entitled to attorneys' fees unless provided for by law) before laying out the rules governing the arbitration procedures. (*Id.* at 3.)

Attached to the email circulating the Agreement was a document entitled "FAQs re Mutual Arbitration Agreement." (*See generally*, FAQs (dkt. #10-2) 9-10.) That document explained: (1) the Agreement was to arbitrate wage and hour claims, in lieu of court litigation; (2) the Agreement did not extend to all claims, but only wage and hour claims; (3) "[a]rbitration is a forum for dispute resolution where the dispute is presented by each side to a neutral decision-maker, an arbitrator, who then makes a decision on the appropriate outcome"; (4) "arbitration is essentially an informal trial in front of the arbitrator," which is "typically not appealable," while litigation is longer and more formal, in which "issues may be presented to a judge or jury (or both)," with the possibility of appeal, "often adding a period of years before final resolution of the case"; (5) arbitration

5

was selected, in part, to resolve claims "more quickly and efficiently" and because it "can be considerably less costly for both parties than litigation"; (6) Epic would pay the arbitrator and administrative fees, "[o]ther than a filing fee, which would be the same or less than in state court"; and (7) the American Arbitration Association would select the arbitrator from a list of possible arbitrators after the parties had reviewed, struck, and ranked the options. (*Id.*) The FAQ document also confirmed that the Agreement required the waiver of class claims, adding that

> A class claim requires you to participate as part of a larger group. Because any individual employee's issues or concerns will not be particularly important to resolution of a class claim, they may not get addressed at all. Individual arbitration focuses on the individual claim of the employee. Class action claims are also complex to litigate; they take a long time and they involve lots of legal fees to defend. Additionally, attorneys, not employees, are usually the biggest winners in class actions, often charging very large fees to both the class and the company

(*Id.* at 10.)

Plaintiff Schultz remained employed at Epic as of April 12, 2016, when the Arbitration Agreement took effect, and she continued her employment until May 22, 2017. (Schultz Decl. (dkt. #32) ¶ 3.)

OPINION

Defendant moves to dismiss this lawsuit under Rule 12(b)(1), requesting that the court compel plaintiff to arbitrate her claims on an individual basis. (*See* Def.'s MTD Br. (dkt. #9) 1-2.) "Because a motion to compel arbitration is essentially a claim that the court lacks subject matter jurisdiction, it is proper for the court to consider matters beyond the allegations in the complaint." *Hankee v. Menard, Inc.*, No. 07-C-661-C, 2002 WL

32357167, at *1 (W.D. Wis. Apr. 15, 2002) (citing *Capitol Leasing Co. v. Fed. Deposit Ins. Corp.*, 999 F.2d 188, 191 (7th Cir. 1993)). The burden of establishing proper subject matter jurisdiction rests on the party asserting it. *Muscarello v. Ogle Cnty. Bd of Comm'rs*, 610 F.3d 416, 425 (7th Cir. 2010). Typically, that is the plaintiff, and this case starts behind the proverbial eight ball in the form of an unambiguous agreement compelling arbitration.

In response, plaintiff relies principally on the United States Supreme Court's recognition in *Lewis* that an otherwise binding arbitration agreement may still be invalidated if found unconscionable. 138 S. Ct. at 1622-23. Accordingly, for purposes of determining jurisdiction, the sole question here comes down to whether the Arbitration Agreement is unconscionable under Wisconsin law. *See Villalobos v. EZCorp. Inc.*, No. 12-cv-852-slc, 2013 WL 3732875, at *2 (W.D. Wis. July 15, 2013) (Under Wisconsin law, "unconscionability means 'an absence of meaningful choice on the part of one of the parties together with contract terms which are unreasonably favorable to the other party.'" (quoting *Disc. Fabric House of Racine, Inc. v. Wis. Tel. Co.*, 117 Wis. 2d 587, 601, 345 N.W.2d 417 (1984))).

Under Wisconsin law, the common law doctrine of unconscionability exists to prevent "oppression or unfair surprise," but not "disturbance of allocation of risks because of superior bargaining power." *Wis. Auto Title Loans, Inc. v. Jones*, 2006 WI 53, ¶ 32, 290 Wis.2d 514, 714 N.W.2d 155 (2006) (quoting Richard A. Lord, *Williston on Contracts* § 18.8, at 49-50 (4th ed. 1998)). "A contract is unconscionable when no decent, fair-minded person would view the result of its enforcement without being possessed of a profound sense of injustice." *Hankee*, 2002 WL 32357167 at *4 (quoting *Foursquare Props.*

7

*Joint Venture I v. Johnny's Loaf & Stein, Ltd.*, 116 Wis.2d 679, 681, 343 N.W.2d 126 (Ct. App. 1983)). Moreover, plaintiff bears the burden to establish unconscionability. *Villalobos*, 2013 WL 3732875, at *2 (citing *Green Tree Fin. Corp. Alabama v. Randolph*, 531 U.S. 79, 91 (2000)).

Procedural and substantive unconscionability factors must be weighed "on a case-by-case basis." *Id.* (internal citations omitted). As the Wisconsin Supreme Court explained, "[t]he more substantive unconscionability present, the less procedural unconscionability is required, and vice versa." *Jones*, 2006 WI 53, ¶ 33. However, a quantum of each is required. *Id.*

## I. Procedural Unconscionability

Procedural unconscionability examines the contract's formation "to determine whether there was 'a real and voluntary meeting of the minds.'" *Clemins v. GE Money Bank*, No. 11-CV-00210, 2012 WL 5868659, at *4, (E.D. Wis. Nov. 20, 2012) (quoting *Jones*, 2006 WI 53, ¶ 34). Courts consider factors such as the parties' "age, education, intelligence, business acumen and experience, relative bargaining power, who drafted the contract, whether the terms were explained to the weaker party, whether alterations in the printed terms were possible, [and] whether there were alternative sources of supply for the goods in question." *Disc. Fabric,* 117 Wis. 2d at 602 (citation omitted).

Plaintiff raises a number of concerns that she contends render the Arbitration Agreement procedurally unconscionable. *First*, she argues that Epic "coercive[ly]" disseminated the Agreement, thereby preventing a meeting of the minds. (Pl.'s Suppl. Resp. to Def.'s Mot. Dismiss (dkt. #31) 4.) In particular, she contends that the quality

assurance employees lacked "a meaningful choice as to whether to accept the terms of the Arbitration Agreement" because they were not able to negotiate or obtain additional information beyond the FAQ document provided with the agreement itself. (*Id.* at 5.) Implicit in this argument is the contention that Epic exploited its stronger bargaining power. (*See Lewis* Opp'n (15-cv-82-bbc, dkt. #42) 17-18.)

While plaintiff's concern is understandable, it is not enough to render the agreement to arbitrate unconscionable. In fact, she and the other quality assurance employees *did* have a meaningful choice: accept the terms of the Arbitration Agreement and remain employed or reject it and look for work elsewhere. Stark as that choice may have been, current, controlling case law holds that remaining employed on the effective date of the Arbitration Agreement provided sufficient consideration and indicates there was a meeting of the minds. *See Tinder v. Pinkerton Sec.*, 305 F.3d 728, 734 (7th Cir. 2002) (In Wisconsin, "at-will employees give adequate consideration for employer promises that modify or supplant the at-will employment relationship by remaining on the job." (citations omitted)); *see also Hankee*, 2002 WL 3257167, at *4 ("Contrary to plaintiff's suggestion, she did have a choice: she could have rejected the terms of the agreement and found employment elsewhere."); *Lewis*, 2019 U.S. Dist. LEXIS 11937, at *12-*13 (declining to find arbitration agreement lacked consideration).

Plaintiff further contends that the information provided did not clearly lay out that option (Pl.'s Suppl. Resp. to Def.'s Mot. Dismiss (dkt. #31) 5), but (1) the circulating email told employees that the Agreement "is effective on April 12, 2016, *provided you remain employed on that date*" (Mar. 29, 2016 Email (dkt. #10-2) 2 (emphasis added)), and (2) the Agreement itself states that "I understand that if I continue to work at Epic, I will be

deemed to have accepted this Agreement" (Arbitration Agreement (dkt. #10-1) 2). The only reasonable interpretation of these statements is that an employee would be subject to the Arbitration Agreement if she chose to continue working at Epic on or after April 12, 2016.[4]

Accordingly, as Epic points out, plaintiff had the opportunity to avoid the Arbitration Agreement by resigning before the effective date. (Def.'s Suppl. Mem. Supp. Mot. Dismiss (dkt. #33) 5.) At minimum, those roughly two weeks between receiving the Agreement and its taking effect, was sufficient time to read and consider the materials, which were "written in plain terms[ and] in a regular sized font," and consider the option of quitting. (*Id.* at 3.)[5] Finally, it is well established that unequal bargaining power is not

---

[4] This is actually an arguable difference between *Lewis* and this case, that makes plaintiff's claim here weaker. In *Lewis*, the arbitration agreement arguably went into effect immediately. (*Lewis* Opp'n (15-cv-82-bbc, dkt. #42) 4 ("I understand that if I continue to work at Epic, I will be deemed to have accepted this Agreement." (quoting the *Lewis* arbitration agreement)).) Here, Schultz arguably had more time to consider the option of quitting, if only a couple of weeks, before being bound by the Agreement.

[5] Of course, the use of "plain English" alone cannot "defeat a showing of a quantum of procedural unconscionability." *Jones*, 2006 WI 53, ¶ 57. Here, however, plain English and appropriate font size, plus plaintiff's educational and professional background, militate against a finding of procedural unconscionability. Moreover, the fact that plaintiff arguably lacked the opportunity to ask questions about the Agreement or negotiate the specific terms is ultimately irrelevant. *See Jones*, 2006 WI 53, ¶¶ 52-53 (explaining that "a contract entirely prepared by one party and offered to another who does not have the time or the ability to negotiate about the terms" is an adhesion contract and that "adhesion contracts are [ordinarily] valid"). In *Jones*, the Wisconsin Supreme Court did find an adhesion contract was part of "a quantum of procedural unconscionability." However, that finding was also based on the contract at issue related to an auto title loan that the defendant took out and that "the borrower was indigent, needed money, and was in a weak bargaining position." 2006 WI 53, ¶¶ 43-50. Plaintiff offers no such evidence here. Moreover, defendant credibly contends that it has a corporate culture with an "open-door, first-name policy" that encourages questions about employment. (Redbook Excerpt (dkt. #34-1) 5-6.) Nor does plaintiff assert that she *had* any unanswered questions, only that she "was not provided with an opportunity by Epic to ask questions." (Schultz Decl. (dkt. #32) ¶ 6.) *See Lewis*, 2019 U.S. Dist. LEXIS 11937, at *7-*8 (rejecting plaintiff's argument that arbitration agreement was procedurally unconscionable because it was presented "on a take-it-or-leave-it basis, without giving plaintiff any opportunity to reject it or ask questions").

enough to invalidate an employment-context arbitration agreement. *Hankee*, 2002 WL 3257167, at *4 (citing *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33 (1991)).

*Second*, plaintiff contends that the Arbitration Agreement was circulated with "a misleading email claiming arbitration allows [the quality assurance employees] to pursue claims as if they were in court" when in fact: (1) litigation would permit discovery broader than 25 document requests, two days' of depositions and a single interrogatory; and (2) litigation would provide opportunities for a jury trial and appeal, which are both unavailable in arbitration. (Pl.'s Suppl. Resp. to Def.'s Mot. Dismiss (dkt. #31) 4.) Likewise, she contends that the FAQ document was misleading in its description of class action lawsuits. (*Id.* at 4-5.)

In response, defendant contends the challenged statements are not misleading, and that it is plaintiff who "misrepresents" the statements. (Def.'s Suppl. Mem. Supp. Mot. Dismiss (dkt. #33) 7-8.) The court largely agrees. While the March 26, 2016, email notes that "[t]he same laws apply in both [litigation and arbitration]," it also explains that "[a]rbitration is a process outside of the court system that will allow you to pursue your individual claims with many of the rights and procedures that would be available in a lawsuit," but that "arbitration puts some reasonable limits on processes." (Mar. 26, 2016 Email (dkt. #10-2) 2.) Moreover, the Agreement itself specifies discovery limitations that will apply in arbitration, while noting that the arbitrator "may allow additional discovery upon a showing of substantial need by either party or upon a showing of an inability to pursue or defend certain claims without such additional discovery." (Arbitration Agreement (dkt. #10-1) 3.) The FAQ document also explains the differences between arbitration and litigation:

11

> An arbitration is essentially an informal trial in front of the arbitrator. . . . [D]ecisions in arbitration are typically not appealable. If you went to court (litigation), the issues may be presented to a judge or jury (or both), and the process is subject to more formal rules and usually takes a much longer time to get resolution. In addition, court cases can be appealed[.]

(FAQs (dkt. #10-2) 9.)

While these statements may emphasize the benefits of arbitration, and even portray some of its limitations as a positive trade off, there is nothing that is materially misleading in the information provided to the quality assurance employees regarding the differences between litigation and arbitration. *See Lewis*, 2019 U.S. Dist. LEXIS 11937, at *10 (rejecting plaintiff's argument that defendant misled employees with statements that arbitration allowed employees to pursue claims "as if [they] were in court"; "[t]he same laws apply"; and arbitration "can provide the same remedies as if you were in court"). Moreover, nothing prevented plaintiff or others presented with the Agreement from doing research or consulting others as to the pros and cons of arbitration as an alternative means of dispute resolution.

Plaintiff's concerns about defendant's statements regarding class actions are similarly overblown. Through the FAQ document, the quality assurance employees *were* informed that "[b]ecause any individual employee's issues or concerns will not be particularly important to resolution of a class claim, they may not get addressed at all." (FAQs (dkt. #10-2) 10.) Plaintiff contends that this is misleading. (Pl.'s Suppl. Resp. to Def.'s Mot. to Dismiss (dkt. #31) 4-5.) Certainly, the answer could have been more neutrally worded and acknowledged the possible merit of allowing class actions where "there are questions of law or fact common to the class" and those questions "predominate

over any questions affecting only individual members." Fed. R. Civ. P. 23(a)(2), (b)(3). (*See also* Pl.'s Suppl. Resp. to Def.'s Mot. Dismiss (dkt. #31) 5 (noting that "the actual purpose of a collective or class action . . . is to resolve only the common issues shared by a group of employees").) Still, defendant has no fiduciary duty of full disclosure to its employees, and to the extent it was attempting to put the merits of "simple," individual arbitration over class actions, its rhetoric was not unconscionable under Wisconsin law, especially since the employees had time to research and consider these alternatives.

Plaintiff also objects to the statement that "attorneys, not employees, are usually the biggest winners in class actions" as both inaccurate and unsupported. (Pl.'s Suppl. Resp. to Def.'s Mot. Dismiss (dkt. #31) 5 (quoting Mar. 29, 2016 Email (dkt. #10-2) 10).) Defendant responds that this statement is obviously one "of opinion -- on an issue on which lawyers, judges, politicians, commentators, and the public have legitimate, good faith differences of opinion -- [that] cannot . . . reasonably be said to have coerced or misled Schultz so as to be unconscionable." (Def.'s Suppl. Mem. Supp. Mot. Dismiss (dkt. #33) 8.) Again, the court agrees. The complete sentence reads: "Additionally, attorneys, not employees, are usually the biggest winners in class actions, often charging very large fees to both the class and the company." (FAQs (dkt. #10-2) 10.) While not expressly labeled as a statement of opinion, the belief that lawyers benefit more than plaintiffs in class actions is a common one, albeit open to debate. *See, e.g.*, Lisa Nagele-Piazza, *Wage and Hour Class Actions Can Cost Employers Millions*, Soc'y for Hum. Resource Mgmt. (Feb. 5, 2018), https://www.shrm.org/resourcesandtools/legal-and-compliance/employment-law/pages/wage-and-hour-class-actionss.aspx (explaining that wage and hour disputes "are cash cows for plaintiffs' attorneys because fees are relatively easier to obtain than in other

forms of commercial litigation and because liquidated damages may be included"); Daniel Fisher, *Study Shows Consumer Class-Action Lawyers Earn Millions, Clients Little*, Forbes (Dec. 11, 2013, 8:46 a.m.), https://www.forbes.com/sites/danielfisher/2013/12/11/with-consumer-class-actions-lawyers-are-mostly-paid-to-do-nothing/ ("Plaintiff lawyers often win even when they lose. About a third of the cases are voluntarily dismissed with the lawyers and a few select plaintiffs being paid to go away, while the rest of their would-be clients get nothing. Defense lawyers, of course, get paid in *every* case."). And again, even if read as a statement of fact, it is unlikely that statement would have materially changed an employee's analysis, especially in the context of the immediately preceding sentence stating that "Class action claims are also complex to litigate; they take a long time and they involve lots of legal fees to defend." (FAQs (dkt. #10-2) 10.) Regardless, this is rhetoric, not unconscionable behavior, at least absent a fiduciary relationship.

*Third*, and finally, plaintiff contends that she "was not informed by anyone at Epic that [she] may have a pending legal claim for unpaid overtime." (Schultz Decl. (dkt. #32) ¶ 9; *see also Lewis* Opp'n (15-cv-82-bbc, dkt. #42) 20-21.) Predictably, defendant responds that requiring employers to inform employees about potential, pending claims would be a slippery slope: "any employer who believes that an employee may file suit in court [could] never ask for or require the employee to participate in arbitration (no matter the merits of the potential suit), or [could] only do so after explaining the employee's potential court claims in explicit detail," which defendant argues "would create an exception that would make the [Federal Arbitration Act] completely toothless." (Def.'s Suppl. Mem. Supp. Mot. Dismiss (dkt. #33) 10.) While defendant's response is hyperbolic, and raises a question of public policy, it highlights the weakness of plaintiff's position in light of the law in

Wisconsin as it stands today. Good policy or not, employees are generally responsible for knowing their legal rights, rather than depending on the contracting party sitting across the table from them in a negotiation, even an arguably one-sided one with their employers. If plaintiff wants to foist on employers a duty to uncover and present possible causes of action that employees may currently be able to assert, or compel other disclosures before contracting with employees to waive their right to assert claims in court, the remedy is in the Wisconsin Legislature, not in stretching the law of unconscionability into something it is not.

Importantly, the Agreement did not release any already-accrued claims, rather it required plaintiff and other quality assurance employees' claims to be resolved through arbitration if they wished to remain employed at Epic and filed the claim after April 12, 2016. *See Lewis*, 2019 U.S. Dist. LEXIS 11937, at *10-*11 (rejecting plaintiff's argument that "defendant should have told plaintiff that he may have a pending claim," noting that "the arbitration agreement did not require plaintiff to waive or release already-accrued claims"). Accordingly, plaintiff cannot demonstrate procedural unconscionability. *See Hankee*, 2002 WL 3257167, at *4 (finding plaintiff's unconscionability claim to have "no merit" in part because "plaintiff has not alleged and has not adduced any evidence to show that she was coerced or defrauded into agreeing to the arbitration provision"); *Lewis*, 2019 U.S. Dist. LEXIS 11937, at *7-*11 (finding no procedural unconscionability).

## II. Substantive Unconscionability

Having failed to establish that the Arbitration Agreement was procedurally unconscionable, the inquiry is at an end since plaintiff must, as discussed above, establish

some measure of both procedural *and* substantive unconscionability. *Jones*, 2006 WI 53, ¶ 33. For the sake of completeness, however, the court will briefly consider whether the Arbitration Agreement is arguably substantively unconscionable. "Substantive unconscionability refers to the reasonableness of the contract terms to which the contracting parties agreed, considered in the light of the commercial background and commercial needs." *Villalobos*, 2013 WL 3432875, at *2 (citing *Jones*, 2006 WI 53, ¶¶ 35, 36). Accordingly, it "addresses the fairness and reasonableness of the contract provision subject to challenge." *Jones*, 2006 WI 53, ¶ 35. "Substantive unconscionability focuses on the one-sidedness, unfairness, unreasonableness, harshness, overreaching, or oppressiveness of the provision at issue." *Id.* at ¶ 59. A contract is substantively unconscionable if its terms "are unreasonably favorable to the more powerful party." *Id.* at ¶ 36.

Plaintiff argues that the Arbitration Agreement "manifests substantive unconscionability" because it applies to claims "that employees, not Epic, would bring," while leaving "Epic's ability to sue in court . . . essentially unbridled," creating "severe asymmetry." (*Lewis* Opp'n (15-cv-82-bbc, dkt. #42) 22-23.) While recognizing that Epic would also be forced to arbitrate any "overpayment" claims, plaintiff argues this symmetry is chimerical since Epic has never brought that type of claim against an employee and likely never would. (*Id.* at 23.) Acknowledging the practical strength of this argument, the terms of the Arbitration Agreement do begin with an exchange of promises between Epic and Schultz "to use binding arbitration, instead of going to court, for any 'covered claims.'" (Arbitration Agreement (dkt. #10-1) 2.) Moreover, by definition, those "covered claims" include some claims that employees would bring, as well as some that Epic would bring.

Defendant even identifies "failure to reimburse or repay loans or advances" as one example that it would have to bring in arbitration against a former employee. (Def.'s Suppl. Mem. Supp. Mot. Dismiss (dkt. #33) 12.)[6]

Regardless of past litigation decisions, Epic will be required to arbitrate any future claims for overpayment or repayment. And both sides -- Epic and Schultz -- are required to arbitrate wage-and-hour claims. *See Lewis*, 2019 U.S. Dist. LEXIS 11937, at *11-*12 (explaining that both Epic and plaintiff are "equally bound" to arbitrate covered claims). Neither side can opt out of that required arbitration. *Compare Jones*, 2006 WI 53, ¶ 75 ("We conclude that the broad, one-sided, unfair 'save and except' parenthetical allowing Wisconsin Auto Title Loans full access to the courts, free of arbitration, while requiring the borrower to arbitrate, renders the arbitration provision substantively unconscionable."). The fact that some other claims -- such as those "alleging discrimination, harassment, or retaliation" -- are expressly excluded does not by itself render the Agreement to address wage and hour claims in arbitration substantively unconscionable as long as that commitment runs in both directions. *See Lewis*, 2019 U.S. Dist. LEXIS 11937, at *11 (explaining the agreement only applied to "a narrowly defined category of claims"). Accordingly, the Arbitration Agreement is also not substantively unconscionable.

**III. Relief**

The Federal Arbitration Act specifies that after a court has determined that

---

[6] Defendant also contends that its past failure to bring any overpayment claims should be deemed irrelevant. (*Id.* at 13.)

arbitration is appropriate, the court "shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3. There is also "a judicially-created exception to the general rule which indicates district courts may, in their discretion dismiss an action rather than stay it where it is clear the entire controversy between the parties will be resolved by arbitration." *Villalobos*, 2013 WL 3432875, at *8 (quoting *Green v. SuperShuttle Int'l, Inc.*, 653 F.3d 766, 769-70 (8th Cir. 2011)). Since it is clear that the entire dispute here will be resolved through arbitration, dismissal is appropriate. *See id.* at *9. Likewise, because the Arbitration Agreement waives class and collective claims, the arbitration must move forward on an individual basis between Schultz and Epic.

ORDER

IT IS ORDERED that Defendant's motion to dismiss and compel individual arbitration (dkt. #8) is GRANTED. Plaintiff's case is DISMISSED.

Entered this 25th day of March, 2019.

BY THE COURT:

/s/

_____

WILLIAM M. CONLEY
District Judge